IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DOUGLAS LEE FREEMAN, ) | | |
|     Plaintiff, ) | Civil Case No. 7:16cv00061 | |
| ) | | |
| v. ) | MEMORANDUM OPINION | |
| ) | | |
| HAROLD CLARKE, *et al.*, ) | By: Norman K. Moon | |
|     Defendants. ) | United States District Judge | |

Plaintiff Douglas Lee Freeman, a Virginia prison inmate proceeding *pro se*, filed this civil rights action under 42 U.S.C. § 1983 against various staff and officials at Red Onion State Prison ("Red Onion") and in the Virginia Department of Corrections ("VDOC"). Plaintiff contends that Defendants have denied him due process and equal treatment by placing and maintaining him in segregated confinement for administrative reasons and have subjected him to cruel and unusual living conditions. After review of the record, I conclude that Defendants' motion for summary judgment must be granted.

I.

Red Onion and Wallens Ridge State Prison ("Wallens Ridge") house all VDOC Security Level S ("SLS") inmates, those who must be managed in a long-term segregation setting.[1] Under current policies, once a VDOC inmate is classified as SLS, officials transfer him to one of these facilities, where he may participate in the Segregation Reduction Step-Down Program set out in Operating Procedure ("OP") 830.A. (OP 830.A, at 12-37, docket no. 19-1). This version

---

[1] According to the VDOC operating procedure for security level classification, effective on January 1, 2015, inmates are classified to Level S based on "segregation qualifiers," including the following: aggravated assault on a staff person or on another offender using a weapon or resulting in serious injury; serious risk of escape; "[c]ommission of a crime of exceptional violence and/or notoriety"; "[e]xcessive violent [d]isciplinary [c]onvictions"; fire setting or rioting in prison that harmed a person or caused extensive property damage; hostage taking; possessing firearms or other weapons; gang activity or leadership; and manipulating staff or displaying predatory behavior. (*See* OP 830.2, § IV, ¶ G, http://www.vadoc.virginia.gov/about/procedures (last visited Feb. 27, 2017).

of the step-down procedure became effective on February 18, 2013, with the stated purpose to provide "established procedures for incentive based offender management which will create a pathway for offenders to step-down from Security level S to lower security levels in a manner that maintains public, staff and offender safety." (OP 830.A, § I.)

Each newly classified SLS inmate is assessed and assigned to the appropriate privilege level: intensive management ("IM"), special management ("SM"), or the reentry unit (reserved for inmates within two years of release). An inmate is assigned to SM status if evaluators find that he has a history of "repeated disruptive behavior at lower level facilities, . . . fighting with staff or offenders, and/or violent resistance" that harmed staff or other inmates, but "without the intent to invoke serious harm, . . . kill, or [cause] serious damage to the facility." (OP 830.A, § III.) Inmates are further sub-classified under OP 830.A as follows, starting with IM-0, the most restrictive status, and ending with the general population, the least restrictive:

>Intensive Management (IM):
>IM-0
>IM-1
>IM-2
>IM-SL6
>Special Management (SM):
>SM-0
>SM-1
>SM-2
>SM-SL6
>Step-Down—Level 6 General Population
>Structured Living—Phase 1 and Phase 2
>Security Level 5 General Population

The step-down program in OP 830.A is a so-called cognitive program that involves meeting pro-social goals and requires the inmate to complete a seven-workbook set called the *Challenge Series*, remain infraction free, exhibit responsible behavior, and participate in self-improvement and education programs. When an inmate meets the goals designated for a step, he

may be advanced to the next step and receive the additional privileges assigned to it. When he completes the *Challenge Series*, he may be decreased to Security Level 6 ("SL6"), where inmates live in double cells and may associate with other inmates in a group setting without restraints. If the inmate completes the goals in SL6, he may then be reduced to Security Level 5 and be placed in a general population setting.

While assigned to any of these segregation levels, the inmate's classification status will be periodically reviewed by the Institutional Classification Authority ("ICA"). Members of the Unit Management Team, a multi-disciplinary group of staff who work in the housing units, track and rate each inmate's progress toward the goals of his assigned step. They rate his behavior every week as poor, acceptable, or good in each of several categories, such as personal hygiene, standing for count, and respect. Counselors rate the inmate's program participation every week as incomplete, complete, or positive effort. Officers in each of these groups are encouraged to communicate with inmates about these ratings — to acknowledge positive performance and motivate improvement where needed.

In addition to Unit Management Team review of an inmate's classification status, certain classification decisions are also reviewed by a Dual Treatment Team made up of officials from both Red Onion and Wallens Ridge, by the wardens of the two institutions, or by the VDOC regional operations chief. In addition to this multi-level review scheme, "[a] team external to [Red Onion and Wallens Ridge] will perform an annual review of each [Level S] offender's case." (OP 830.A, § IV, ¶ K.1.a.) This review includes a reassessment of whether the inmate continues to meet the criteria for the IM or SM path to which he has been assigned. According to OP 830.1, § IV, ¶ G, all classification decisions may be appealed through the Offender Grievance Procedure, to which Level S inmates have access.

3

All SLS inmates in the IM and SM categories are housed in single cells. When any SLS inmate leaves his cell, he will be restrained in handcuffs and shackles. In full restraints, he is then escorted by two officers at all times to recreation, to the shower, or to medical appointments. Outdoor recreation consists of being locked in a fenced, cage-like area to walk or do calisthenics.

On the other hand, the segregation cells provide living conditions approximately the same as those provided to general population inmates, and the cell design permits inmates to converse with and be observed by staff members. Per policy, SLS inmates receive meals in their cells (the same number and types of meals that inmates in general population units receive), are permitted to shower and shave not less than three times per week, and have out-of-cell recreation for one hour, up to six days per week. They have the same mail regulation and privileges as inmates in other housing assignments, receive clean clothes and bed linens, and have access to medical and mental health care. They are allowed visitation, use of a telephone, access to legal services and library books; they may possess items of personal property (including religious materials) and may order items from the prison commissary.

When SLS inmates complete the *Challenge Series* curriculum and evaluators deem that they have achieved the behavioral goals at IM-2 or SM-2, the SM and IM pathways diverge. The SM status inmate will be stepped down from SM-2 and SLS to Security Level 6 ("SM-SL6"). At this point, officials assess each inmate and assign him to one of three SL6 step-down pods geared to safely reintroduce him into a social environment to interact with other inmates and test his readiness for possible transfer to Level 5 and, eventually, to other non-segregation settings.

Inmates in the SM-SL6 step-down program may progress through two phases. In SM-SL6 Phase 1, they are still in single cells, but they are permitted to leave their cells unrestrained for movement to the shower and recreation and, gradually, to participate in the *Thinking for a Change* curriculum with other inmates in groups of up to fifteen participants. Inmates in SM-SL6 Phase 2 are double-celled and unrestrained for showers and recreation, have outside recreation with other inmates for an hour, twice a week, and can walk to meals with other inmates to eat their meals together in the dining hall.

After IM-2 and SM-2, the IM pathway under OP 830.A is different than the SM pathway. If an inmate reaches IM-2 status, and officials determine that he cannot progress to the SM pathway, he can become eligible for assignment to the lowest security level for an IM status inmate: IM-Security Level 6, also known as the Closed Pod. The Closed Pod is expressly designed "to create an opportunity for an increased quality of life for offenders possibly facing a long term in high security." (OP 830.A, § IV, ¶ G.1.) Closed Pod inmates continue to have single-celled housing, segregated showers and recreation areas, and out-of-cell restraints, shackles, and dual escorts. Closed Pod inmates can, however, earn more privileges than any other group of IM inmates, such as more in-pod job assignments, more programming in-cell and in small groups in secure chairs, MP3 players, video visitation, and longer in-person visitation.

Freeman is in VDOC custody serving a life sentence plus 33 years and 9 months. In July 2015, the Institutional Classification Authority ("ICA") at River North Correctional Center transferred Freeman to Red Onion to be assessed for long-term administrative segregation. The ICA at Red Onion reviewed Freeman's classification status in August and recommended assigning him to SLS. Among other things, the ICA noted that since the beginning of 2015, Freeman had incurred 19 institutional infractions, including a charge for making threats to kill

5

the president, five charges for possession of a weapon, and a charge for assaulting a correctional officer in the head.  The ICA's recommendation for SLS status was approved by appropriate officials.  During an informal review in September 2015, officials assigned Freeman to the IM pathway.  The ICA conducted reviews in October and December and recommended continuing him in that status.  At his review in March, the ICA noted that he was progressing in the step-down program, but had not met all required criteria.  The recommendation was for his advancement to IM-1 status.

Per policy, Freeman will continue to receive ICA reviews of his classification status.  If he progresses through the step-down program, reaches established goals, and remains infraction free, he can be recommended for IM-2, with the same basic privileges as SM-2.  Eventually, he can qualify for transfer to IM-SL6, the Closed Pod, and its additional privileges, programming, and socialization opportunities.

Freeman filed this § 1983 complaint in February 2016, suing various VDOC and Red Onion officials.  Liberally construing his complaint, he claims that (1) Defendants assigned and maintained him on the IM pathway without due process; (2) the differences in privileges for SM status inmates and IM status inmates violate his right to equal protection; and (3) conditions in IM status violate the Eighth Amendment.  Specifically, Freeman contends that officials assigned him to the IM pathway without allowing him to be present, call or question witnesses, or present evidence to challenge this classification change.  When he complained, his counselor advised him that per policy, the hearing was an informal one.  Freeman wrote letters on this issue to the warden and the VDOC director, but they failed to intervene.  He tried to challenge his IM status through the grievance procedure, but was told that only his assignment to SLS status is grievable.

6

Freeman complains, generally, that OP 830.A is inconsistent with other VDOC policies on classification hearings and housing and that Red Onion officials have violated their own policies.

Freeman also alleges specific ways that inmates on IM status and SM status are treated differently. SM inmates may complete part of the step-down program in only 90 days, but IM inmates must wait 180 days. When IM inmates complete the *Challenge Series,* they go to another segregation area, the IM/SL6 Closed Pod, while SM inmates who complete the same workbooks can transition to general population. IM inmates must be in restraints for contact visits, while SM inmates are not in restraints. IM inmates cannot receive jobs until they have advanced to IM-2, but SM inmates are eligible for jobs at SM-1. SM inmates can walk to chow hall and the gym, interact with other inmates, have in-pod recreation, and play sports for recreation, but IM inmates cannot have contact with other prisoners and have outside recreation in a cage. SM inmates can attend group religious services, while IM inmates cannot. As relief in this action, Freeman seeks compensatory and punitive damages, as well as injunctive relief ordering that IM status and the *Challenge Series* program be abolished.

Defendants have filed a motion for summary judgment supported with the warden's affidavit about the step-down program and copies of several VDOC policies, including OP 830.A. Freeman has responded to the motion, making the matter ripe for consideration.[2]

II.

---

[2] Freeman has twice submitted an "Affidavit" claiming that any defendant who did not submit an affidavit in support of the summary judgment motion should be held in default. (Freeman Aff. 1-2, docket nos. 24-25.) I will construe this affidavit (submitted twice) as a motion for entry of default under Rule 55 of the Federal Rules of Civil Procedure. Because all of the defendants filed a timely answer and motion for summary judgment, however, I cannot find that they have "failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Therefore, I must deny Freeman's motions seeking entry of default.

7

A. Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "In reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

Freeman filed a verified complaint, which is the "the equivalent of an opposing affidavit for summary judgment purposes." *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 516 (4th Cir. 2015) (internal quotation marks omitted). Detailed factual allegations in a verified, *pro se* complaint may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." (emphasis omitted) (citation omitted)). Freeman cannot defeat Defendants' properly supported summary judgment motion, however, with mere groundless generalizations or speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact.").

B. Due Process.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation,[3] a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

As a convicted prisoner, Freeman does not have an inherent, constitutionally protected liberty interest in release from a more restrictive security classification. *Id.* at 221-22. A state-created liberty interest may exist, however, if Freeman (a) points to "a basis for an interest or expectation in state regulations" in avoiding the conditions of his confinement under the segregation classification scheme at Red Onion, *Prieto*, 780 F.3d at 250; and (b) shows that those conditions "impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Only if Freeman makes both showings does the Due Process Clause require a particular measure of procedural protection before he can be deprived of his liberty interest. *Id.*

Freeman expressly states that he is challenging his classification to IM status instead of SM status under OP 830.A and the decisions continuing his assignment within that pathway. He apparently believes that these procedures stand in his way of being released sooner from

---

[3] Freeman may also be contending that OP 830.A violates his substantive due process rights. Such a claim fails, however. It is well established that "the Due Process Clause affords [the inmate] no greater protection than does the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 327 (1986). Thus, Freeman's claims that living conditions in segregation constitute punishment "fall squarely within the ambit of the Eighth Amendment — not the due process clause." *See Prieto v. Clarke*, 780 F.3d 245, 251 (4th Cir. 2015). Therefore, I will address separately Freeman's complaints about the ill effects of living conditions at Red Onion, under the applicable legal standard for Eighth Amendment claims.

9

segregation to general population conditions. I conclude that OP 830.A creates an expectation that SLS offenders will receive reviews of their classification status by the ICA with regular frequency. Specifically, OP 830.A, § IV, ¶ K.5 and Appendices F and G provide that the ICA will review SLS inmates' statuses every 90 days and decide whether their step assignments are appropriate. I conclude that this periodic review policy creates a potential liberty interest for Freeman in being released from the restrictive conditions of his current security classification. *See Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2016) (finding that state prison's policy requiring periodic classification reviews for segregation inmates created potential liberty interest).

I must next determine if Freeman's continued confinement in IM status imposes "atypical and significant hardship" compared to the "ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. The "conditions dictated by a prisoner's conviction and sentence are the conditions constituting the 'ordinary incidents of prison life' for that prisoner." *Prieto*, 780 F.3d at 253. Because Freeman was previously assigned to a general population status, I will use that status as the normative baseline for his due process claim. *See Incumaa*, 791 F.3d at 527.

Mere limitations on privileges, property, and activities for administratively segregated inmates . . . fall[ ] within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485; *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a prisoners' [sic] location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges — matters which every prisoner can anticipate are contemplated by his original sentence to prison — are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently"). It is well

10

established that a temporary assignment to segregated confinement — thirty days or even six months, with reduced privileges, few out-of-cell activities or socialization opportunities, and heightened security measures — is *not* atypical or significant hardship. *See Sandin*, 515 U.S. at 485-86; *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (finding six months under conditions dictated by administrative segregation policies was not atypical under *Sandin*). "The State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson*, 545 U.S. at 227. Thus, "correctional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face" in maintaining prison security and safety. *Florence v. Bd. of Chosen Freeholders*, 132 S. Ct. 1510, 1515 (2012). Accordingly, current precedent mandates minimal court involvement "in the day-to-day management of prisons." *Wilkinson*, 545 U.S. at 222 (citing *Sandin*, 515 U.S. at 482-83).

The Supreme Court in *Wilkinson* found that the challenged supermax confinement conditions imposed atypical and significant hardship under *Sandin* based on three distinctive characteristics. First, these supermax inmates were "deprived of almost any environmental or sensory stimuli and of almost all human contact." *Wilkinson*, 545 U.S. at 214. Second, they were assigned to supermax status for "an indefinite period of time, limited only by [the] inmate's sentence." *Id.* Third, "[i]nmates otherwise eligible for parole los[t] their eligibility while incarcerated" at the supermax. *Id.* at 215. The Court held: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." 545 U.S. at 224. Similarly, in *Incumaa*, the Fourth Circuit found a protected liberty interest in avoiding assignment to South Carolina's supermax based on the isolating and restrictive nature of the living conditions

11

combined with the length and indefiniteness of the plaintiff's twenty-year confinement there.[4] 791 F.3d at 531-32.

The prison policies in these cases provided "no indication how long [an inmate] may be incarcerated [at the supermax] once assigned there," *Wilkinson*, 545 U.S. at 215, because they provided for infrequent review of the continued appropriateness of an inmate's specific segregation status and/or offered no clear criteria for him to become suitable for release from the supermax. *Incumaa*, 791 F.3d at 522-23. Authorities repeatedly recommended the inmates' retention at the supermax without providing any behavioral basis for doing so. *See, e.g., id.* at 521-23.

Conditions of confinement in the VDOC's "special housing" units, including SLS, are highly restrictive. SLS inmates face single-cell assignment, little face-to-face contact with other inmates, and limited freedom of movement and privacy. The mere existence of these conditions at Red Onion, however, does not render confinement there atypical or significantly harsh, because general population inmates can expect temporary terms in segregated confinement under similar restrictions. *See Sandin*, 515 U.S. at 486 (thirty days); *Beverati*, 120 F.3d at 504 (six months).

Moreover, in most other ways, living conditions in SLS approximate conditions for general population inmates. As stated, SLS inmates receive laundry services and visitation opportunities. They have access to hygiene and legal materials, telephone usage, legal counsel, medical and mental health care, library books, commissary items, ingoing and outgoing mail services, and the grievance procedure. They may possess property items, including religious

---

[4] In addition to these conditions, the plaintiff in *Incumaa* was subjected to "a highly intrusive strip search every time he [left] his cell." 791 F.3d at 531.

12

materials, in their cells. Per policy, SLS inmates receive the same types of meals that general population inmates receive.

Freeman complains that as an IM status inmate he cannot socialize with other inmates. However, the facts in this record do not support a finding that Freeman or other IM inmates at Red Onion are subjected to the sort of prolonged, extreme deprivation of sensory stimuli or social contact that gave rise to the concerns in *Wilkinson*, 545 U.S. at 214 (noting that supermax inmates were "deprived of almost any environmental or sensory stimuli and of almost all human contact" . . . "for an indefinite period of time").

Most importantly, Freeman's confinement under the most restrictive conditions for IM inmates is not indefinite. As stated, VDOC policy requires review of each inmate's SLS status every 90 days, and it is undisputed that Freeman received these reviews at the required frequency. The step-down policy clearly defines actions he can take to be considered for status changes to less restrictive conditions: participating in the step-down programming, holding a job assignment, and remaining infraction free. Thus, Freeman's progress (or lack of progress) toward less restrictive conditions rests, in large part, on his choices. When he made progress toward the step-down program goals, officials advanced him to IM-1, with greater privileges and opportunities. Moreover, the policy and the evidence indicate that if Freeman chooses to work through the *Challenge Series*, with the goal of changing his attitudes and thinking patterns, and avoided incurring additional disciplinary charges, he will be evaluated for further steps toward IM-SL6 and increased opportunities for activities and privileges.

After careful review of the record, I conclude that the VDOC's policies do not create a constitutionally protected liberty interest in avoiding SLS status or any particular pathway within that status. Specifically, I conclude that the step-down procedures available to SLS inmates

address and alleviate the isolating conditions and indefiniteness identified in *Wilkinson* and *Incumaa* as distinguishing factors of "atypical and significant" hardships presented by a prison's long-term segregation scheme. An IM-0 status inmate is subject to long-term, restrictive conditions, but that status need not be indefinite if the inmate chooses to participate in the step-down procedures. OP 830.A provides behavioral criteria for the inmate to qualify for incremental reductions of restrictions and increases in privileges. With concerted effort to change his thinking and behavior, the inmate can earn his way to enjoyment of additional social interaction and activity while in segregated confinement. As such, under OP 830.A, an inmate's confinement in Red Onion's most restrictive, IM-0 conditions is only as lengthy and restrictive as dictated by his own effort and behavior.

For the reasons stated, I find no material fact in dispute on which Freeman can establish that his confinement at Red Onion under OP 830.A is atypical and significantly harsh compared to conditions contemplated by his sentence.[5] Thus, I conclude that Freeman has no constitutionally protected liberty interest in avoiding any particular security classification or reclassification under OP 830.A. Therefore, he also has no actionable claim under § 1983 that any particular procedural protection is constitutionally required during the OP 830.A classification proceedings.[6] *Sandin*, 515 U.S. at 486-87.

Freeman also has no claim under § 1983 that any of the defendants have misconstrued or misapplied the OP 830.A procedures or other VDOC policies. Such alleged failings are, at most, violations of VDOC policies themselves. State officials' failure to abide by state procedural

---

[5] *See, e.g., Muhammad v. Mathena*, No. 7:14cv00529, 2017 WL 395225 (W.D. Va. Jan. 27, 2017); *DePaola v. Va. Dep't of Corr.*, No. 7:14cv00692, 2016 WL 5415903 (W.D. Va. Sept. 28, 2016).

[6] In any event, even if Freeman could show that IM pathway conditions are atypical, I conclude that the informal status reviews provided regularly to Freeman mirror the procedures found to be constitutionally adequate in *Wilkinson*. 545 U.S. at 224-29.

14

regulations is not a federal due process issue, and is, therefore, not actionable under § 1983. *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

For the stated reasons, Defendants are entitled to judgment as a matter of law as to Freeman's claims that one or more of them placed or maintained him in the IM pathway under OP 830.A without due process in violation of his constitutional rights. I will grant the motion for summary judgment on Freeman's due process claims accordingly.

C. Equal Protection.

The Equal Protection Clause[7] generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). It "does not take from the States all power of classification, but keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks and citations omitted). Thus, to prove an equal protection claim, an inmate "must first demonstrate 'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Id.* (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). He must next show that the policy is not "reasonably related to [any] legitimate penological interests." *Veney*, 293 F.3d at 732 (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)). This element requires the inmate to "allege facts sufficient to overcome the presumption of reasonableness applied to prison policies." *Id.* Freeman does not state facts supporting these necessary elements of his equal protection claim.

---

[7] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

15

First, Freeman has not demonstrated that when officials classified him to IM-0 status, he was similarly situated to inmates in SM status in all relevant respects, such as security risks and history of violent or disruptive behavior. After Freeman received 19 disciplinary charges in six months, including one for assaulting a correctional officer, Red Onion officials could lawfully treat him differently from other segregation inmates with histories of less serious or less recent disciplinary convictions or crimes.

Second, while the OP 830.A step-down procedure purposefully treats SM and IM status inmates differently, these differences are rationally related to legitimate governmental purposes. Namely, this procedure reasonably uses the incentive of earning increased privileges and lower restrictions to encourage improved offender behavior and self-development "in a manner that maintains public, staff and offender safety." (OP 830.A, § I.) The logical connections between the policy's provisions and the furtherance of its legitimate penological goals are self-evident. *See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("[I]nternal [prison] security [is] perhaps the most legitimate of penological goals.").

For the stated reasons, I find no material dispute of fact on which Freeman could prove an equal protection violation here. Therefore, I will grant Defendants' motion on this claim.

### D. Eighth Amendment.

Freeman's final challenge to OP 830.A asserts that his IM status under OP 830.A offends the prohibition against cruel and unusual punishment of the Eighth Amendment, which "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). It is well established that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotation marks and citations omitted). Thus, to sustain an unconstitutional

16

conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). The prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Freeman does not allege that he has been deprived of any necessity for life, such as food or shelter while in IM status. Moreover, he does not identify any physical or emotional harm that he has suffered as an IM inmate or any grave risk that he will suffer such harm in the future. Accordingly, I find no material dispute of fact on which Freeman could prove his claim that he has been subjected to unconstitutional conditions. Therefore, I will grant Defendants' motion as to his Eighth Amendment claim.

### III.

For the reasons stated, I will grant Defendants' motion for summary judgment as to all of Freeman's claims concerning his assignment to IM status at Red Onion. The clerk is directed to send a copy of this opinion and the accompanying order to Freeman and to counsel for Defendants.

**ENTER**: This  27th  day of February, 2017.

*/s/ Norman K. Moon*
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

17